U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

FEB 17 2016

TONY R. MOORE, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| KANSAS CITY SOUTHERN RAILWAY CO. | CIVIL ACTION NO. 1:13-cv-2157 |
| -vs- | JUDGE DRELL |
| PRECISION LAND LEVELING, ET AL. | MAGISTRATE JUDGE PEREZ-MONTES |

## RULING

Before the Court is (1) The Landowner Defendants'[1] Motion for Summary Judgment on Causation (Doc. 161); (2) The Landowner Defendants' Motion for Summary Judgment on Independent Contractor Status and No Legal Duty Owed (Doc. 165); (3) Motion to Strike filed by Plaintiff, Kansas City Southern Railway Co. (Doc. 194); (4) The Landowner Defendants' Motion for Partial Summary Judgment on Plaintiffs' Vicarious Liability Claims (Doc. 201); and (5) American Reliable Insurance Co.'s Motion for Partial Summary Judgment on Kansas City Southern's Loss of Profit Claims (Doc. 203).

For the following reasons, (1) The motion summary judgment on causation (Doc. 161) will be DENIED AS MOOT; (2) the motion for summary judgment on independent contractor status and legal duty (Doc. 165) will be GRANTED; (3) Plaintiff's motion to strike (Doc. 194) will be GRANTED in part and DENIED in part; (4) the motion for partial summary judgment on the

---

[1] The "Landowner Defendants" include: American Reliable Insurance Co., Praetorian Insurance Co., 3-V Partnership, Steven D. Vinson, Donna S. Vinson, Steven B. Vinson, DSK, Ltd., and Dewey Kendrick.

1

vicarious liability claims (Doc. 201) will be DENIED; and (5) the motion for partial summary judgment on Kansas City Southern's loss of profit claims (Doc. 203) will be DENIED.

## I. Background and Procedural History

This suit arises out of a train derailment on March 21, 2013 in Rapides Parish, Louisiana. The derailment occurred at a private railroad crossing located on private farmland owned by DSK, Ltd. (DSK). The land was being cultivated by an agricultural lessee, 3-V Partnership (3-V). 3-V engaged Precision Land Leveling (Precision) to perform dirt work on a washed-out culvert on DSK's land several days prior to the derailment. The dirt work required Precision's employees to drive their tractors, pulling one or two scrapers, across the private railroad crossing. Upon completion of the dirt work, one of the Precision drivers apparently failed to raise the scraper attached to his tractor as he drove over the rails. The scraper apparently contacted the rail causing it to bend and/or become displaced. A few hours later, a Kansas City Southern Railway Co. (KCS) train passed over the damaged rail; three locomotives and 16 train cars derailed.

The railroad has settled with Precision and all claims against it have been dismissed. The only claims remaining are against DSK and 3-V—along with their insurance companies—for vicarious liability pertaining to Precision's actions and for their own personal negligence in failing to provide the proper safety precautions when they authorized the Precision tractors to cross the railroad tracks at the private crossing. Oral argument was held on November 18, 2015, wherein counsel discussed all pending motions before the court. The motions were taken under advisement and are now ripe for consideration.

## II. Discussion

The instant suit comes before us pursuant to the court's diversity jurisdiction. In diversity actions, the Erie doctrine provides that federal courts must apply state substantive law of the forum

2

state and federal procedural law. Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 427 (1996). Accordingly, we apply Louisiana state substantive law to decide the merits of some of the motions before us.

### a. Motion For Summary Judgment Standard

In Federal Court, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the non-movant bears the burden of proof at trial, the movant need not disprove every element of the non-movant's case; rather, the movant can satisfy his burden by pointing to the absence of evidence to support the non-movant's case. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). Further, we consider "all evidence in the light most favorable to the party resisting the motion." Seacor Holdings, Inc. v. Commonwealth Ins. Co., 635 F.3d 675, 680 (5th Cir. 2011) (internal quotations omitted). In this analysis, we review facts and draw all inferences most favorable to the nonmovant, "[h]owever, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment." Eason v. Thaler, 73 F.3d 1322, 1325 (5th Cir. 1996). It is important to note that the standard for a summary judgment is two-fold: (1) there is no genuine dispute as to any material fact, and (2) the movant is entitled to judgment as a matter of law.

### b. Motion to Strike

To decide properly the motions for summary judgment, we must first resolve the issues raised in KCS' motion to strike. (Doc. 194-1). Fed. R. Civ. P. 56(c)(2) provides that "[a] party may object that the material cited [by another] to support or dispute a fact cannot be presented in a form that would be admissible in evidence." There is no need under the current summary judgment standards to file a separate motion to strike; however, the 5th Circuit has simply treated

3

motions to strike material presented with a motion for summary judgment as an objection. See Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co., 671 F.3d 512, 515 (5th Cir. 2012); Fed. R. Civ. P. 56 advisory committee's note to 2010 amendments ("There is no need to make a separate motion to strike."). Thus, Plaintiff's motion to strike will be treated as an objection under Fed. R. Civ. P. 56(c)(2).

KCS objects to certain exhibits attached to the Landowner Defendant's reply brief (Doc. 189) for several reasons. First, KCS contends that certain statements contained in the deposition of Willie Triplett were speculative and also inadmissible because Mr. Triplett responded to leading questions. Second, KCS argues that the photographs of a "low-boy" trailer (Doc. 189-6) are irrelevant. Third, KCS maintains that the attached right-away agreements lack "proper foundation, authentication or admissibility," (Doc. 189-7) and that the unsworn declaration of Defendant's counsel "fails to meet the requirements under the Federal Rules of Evidence for properly authenticating any documents." (Doc. 189-9). Finally, KCS argues that essentially every paragraph in the affidavits of Steven Vinson (Doc. 161-4) and Dewey Kendrick (Doc. 161-5) are improper for numerous reasons, such as: irrelevancy, inconsistency with prior deposition testimony, lack of personal knowledge, the omission of material facts, and the containing of inadmissible legal conclusions.[2]

After considering KCS' objections, we find that they should be granted in part and denied in part. We agree that the photographs of the "low-boy trailer" (Doc. 189-6) are irrelevant for purposes of this case, especially considering that these pictures were simply derived from a "Google" search by Counsel for American Reliable Insurance Company. See Fed. R. Evid. 401.

---

[2] The arguments regarding the affidavits of Dewey Kendrick and Steven Vinson were also included in its Memorandum in Opposition to the Landowner Defendants' motion for summary judgment on independent contractor status and no legal duty owed. (See Doc. 183, p. 44–45).

4

Accordingly, Doc. 189-6 will be stricken from the record. However, having considered KCS' remaining arguments, we find that the other challenged exhibits "would be admissible in evidence," and, thus, are properly considered in deciding the instant motions for summary judgment. See Fed. R. Civ. P. 56.

### c. Independent Contractor Status

Having resolved the evidentiary issues before us, we can now assess the merits of the Landowner Defendant's underlying motions for summary judgment. The primary issue in this case is whether Precision was a servant or an independent contractor (or something else) of either DSK or 3-V. In their motion for summary judgment on independent contractor status, the Landowner Defendants argue that vicarious liability cannot attach under Louisiana Civil Code article 2320 for Precision's actions because Precision was an independent contractor. (Doc. 165-2, p. 10). In response, KCS argues that no independent contractor relationship existed between either DSK or 3-V and Precision, and, in the event the court finds an independent contractor relationship existed, that both parties can still be vicariously liable for Precision's actions because they "authorized an unsafe practice" in allowing Precision's drivers to cross the railroad tracks with "massive, low-clearance earthmoving equipment." (Doc. 183, p. 25).

At oral argument, counsel for KCS was asked to clarify its position on how the law defines the relationship between the Landowner Defendants and Precision. Counsel answered: the "closest we can come up with" is something that falls under the master/servant statutes but is "a little looser" than an employment relationship. Essentially, KCS is arguing that Precision was the "servant" of the Landowner Defendants but was not their "employee" based on a rigid application of the factor test set forth in Hickman v. Southern Pacific Transportation Company, 262 So. 2d 385, 390 (1972) to find that no independent contractor relationship exists.

5

Louisiana law provides that "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed." La. Civ. Code art. 2320. In order to meet the demands of modern commerce, Louisiana jurisprudence has not interpreted this theory of vicarious liability literally. See Blanchard v. Ogima, 215 So. 2d 902, 905 (La. 1968). Over time, 'by inquiring into the overall relationship of the parties and the element of control, our jurisprudence has established reasonable definitions and limitations of vicarious liability to replace the literal codal restriction which has fallen into desuetude." Id. Accordingly, "[i]t is the right of control of the time and physical activities in the other party and the existence of a close relationship between the parties which determine that one is a servant." Id. A principal, however, is not liable for the actions of a non-servant. See id. at 906. A non-servant, such as an independent contractor, is one who "contributes to the business of his employer, but he is not such a part of it that his physical acts and the time to be devoted to the business are subject to control." Id. at 907; Bartholomew v. CNG Producing Co., 832 F.2d 326, 329 (5th Cir. 1987).

In addition to the element of control, the Louisiana Supreme Court has set forth multiple factors to determine whether an independent contractor relationship exists. See Hickman, 262 So. 2d at 390. In Hickman, the Court held that an independent contractor relationship "presupposes a contract between the parties, the independent nature of the contractor's business and the nonexclusive means the contractor may employ in accomplishing the work." Id. The contract should also call "for specific piecework as a unit to be done according to the independent contractor's own methods, without being subject to the control and direction, in the performance of the service, of his employer, except as to the result of the services being rendered." Id. Finally, it should "also appear that a specific price for the overall undertaking is agreed upon; that its

duration is for a specific time and not subject to termination or discontinuance at the will of either side without a corresponding liability for its breach." Id. at 390–91. These factors are not a "hard and fast rule, and . . . the distinction between [a servant] and independent contractor status is a factual determination to be decided on a case-by-case basis." See Tate v. Progressive Secc. Ins. Co., 4 So. 3d 915 (La. App. 4 Cir. 2009).

Before we analyze whether Precision was an independent contractor of DSK or 3-V, we must note that, under the terms of the lease agreement, 3-V agreed to indemnify DSK for any liability incurred as a result of "anyone on the premises, whether or not with LESSEE's permission or under LESSEE's supervision or control, for whatever reason or purpose, and regardless of fault." Whether we find that Precision was an independent contractor or not, the only party subject to liability would be 3-V. However, the parties have not briefed this issue, and, thus, we analyze whether an independent contractor relationship existed between Precision and either DSK or 3-V.

In order to determine whether Precision was an independent contractor, we first look to whether either DSK or 3-V had the "right of control" over Precision. It is not the actual supervision exercised by DSK or 3-V, but the right to exercise control over Precision's operations which is our primary concern. See Hickman, 262 So. 2d at 391. As to DSK, KCS argues that Dewey Kendrick had the right to control Precision because he "authorized" the work to be done. After a review of the evidence before us, we can find no facts suggesting that DSK had the right of control over Precision, and find that merely authorizing Steven Vinson to solicit Precision for performance of the dirt work does not constitute control, as a matter of law or fact.

As to 3-V, KCS argues that Steven Vinson "controlled when and how the dirt work was to be performed" because he drove a Precision employee to the washed out culvert, advised him of

7

what work needed to be done, and inspected the work upon its completion. 3-V argues to the contrary that Mr. Vinson merely instructed Precision on the desired result.

We find KCS' argument unavailing and agree with 3-V. The facts are that a few days before the incident, Steven Vinson asked Byron Lemoine, one of Precision's owners, to perform the dirt work on the washed out culvert. Mr. Lemoine agreed to do the work and "allowed [Mr. Vinson] to take my men over there and go show him what needed to be done, and then to do it." (Doc. 183-8, p. 4–5). On March 21, 2013—the day the work was performed—Steven Vinson took a Precision employee (Clifton Breland) to the location of the washed-out culvert and showed him what work needed to be done. (See Doc. 183-9, p. 4 –7).

However, the evidence before us shows that Mr. Vinson only gave instructions on where to get the dirt from and where to put the dirt. (See id. at 6 –7; Doc. 183-16, p. 18). There is no evidence that Steven Vinson had the right to control (nor did he actually exercise control over) Precision's workers other than directing the result of the work. For example, it was Byron Lemoine who determined the kind and amount of equipment and personnel that were to be used to perform the work. (Doc. 183-8, p. 6 –7). After instructing Mr. Breland on the desired result, Mr. Vinson left the property and had no further communications with Precision's workers while the dirt work was being performed, until the following morning. (See Doc. 165-5, pg. 4).

Further, even though neither of Precision's owners were present when the work was being performed, Steven Vinson did not gain the power to control Precision's employees. Ben Lemoine described in his deposition how his employees worked when the owners are not present. He stated, "[w]e don't have employees that are technically in charge. We have a structure of the people that have been there longer typically know what's going on, and they handle things when I myself or my dad are not present." (Doc. 183-7, p. 9–10). In light of these facts, we have found no evidence

8

showing that Steven Vinson had the right to control Precision's employees besides explaining the desired result. See Hickman, 262 So. 2d at 390 (stating that an independent contractor is one who performs work according to his own methods, without being subject to the control and direction of the principal, "except as to the result of the services rendered."). Since we find no right of control by DSK and/or 3-V, Precision cannot qualify as a "servant" under article 2030. Ogima, 215 So. 2d at 905–06.

We have found that Precision was not the servant of either DSK or 3-V but also look to the remaining Hickman factors to determine if there is any difference. First, we find that the dirt work performed by Precision was "independent in nature such that [Precision] may employ non-exclusive means in accomplishing it." See Hickman, 262 So. 2d at 390. On this factor, KCS cites Stovall v. Shell Oil Co., 577 So.2d 732 (La. App. 1st Cir.). In that case, the court found that a contractor's welding services were an integral part of the principal's industrial plant construction business because "[t]o engage in general construction business, the contractor must perform all phases of the project," which included welding. Id. at 739–40.

The instant case is distinguishable. Here, DSK was an agricultural lessor and 3-V cultivated DSK's land. As the lessee of the property, 3-V was responsible for maintaining the dirt roads and culverts. Every year, the DSK and 3-V hired contractors to repair any washed-out culverts on the property. (See Doc. 189-2, p. 10). However, we find that maintaining the roads and culverts was merely incidental to and not an integral part of its farming business. (See Doc. 183-31). Accordingly, this factor also weighs in favor of an independent contractor relationship.

The next factor is whether the parties entered into a contract. The underlying facts demonstrate that Dewey Kendrick authorized Steven Vinson to contact Precision for the repair of the washed-out culvert. Steven Vinson then contacted Byron Lemoine who agreed to have his

9

workers repair the washed-out culvert on DSK's property. (See 183-8, p. 6-7). There was no written contract and a price was not discussed. The Precision workers completed the work on March 21, 2013, but no one was ever billed. In his deposition, Byron Lemoine was asked why he did not send a bill, and he stated "[I]t was kind of a deal, you know, that you throw it in to – because [Steven Vinson's] a good customer. And, you know, when we have good customers, we do a little extra for them at times." (Id. at 7–8).

Although there was no written contract, Byron Lemoine verbally agreed with Steven Vinson to perform the dirt work. See Tate, 4 So. 3d at 920 ("We do not find any requirement in Hickman that the contract be in writing."). However, we also find that no price was fixed as is usually required under Hickman. Further, there was no "agreed" upon duration for the contract, and the parties only had an idea of how long the job would take. (See Doc. 189-2, p. 51 (stating that Clifton Breland told Steven Vinson the job would take less than 30 minutes to complete)). While this may not be an ideal "contract" to establish clearly independent contractor status, we understand there was still an agreement on the work to be done in a timely fashion. This factor would weigh against independent contractor status; however, we find that in light of all the facts and circumstances, Precision was an independent contractor of both DSK and 3-V.

There are two exceptions to the general rule of non-liability. First, a principal may not escape liability arising out of ultrahazardous activities which are contracted out to an independent contractor. Hawkins v. Evans Cooperage Co., 766 F.2d 904, 906 (5th Cir. 1985). This exception has not been argued and is not applicable in this case because the evidence reflects no ultrahazardous work. The second exception, which has been argued by KCS, is that a principal can be liable for the actions of an independent contractor if he "expressly or impliedly authorizes an unsafe practice. Sandbom v. BASF Wyandotte, Corp., 674 So. 2d 349, 353 (La. App. 1st Cir.

1996). KCS argues that Landowner Defendants are liable for Precisions actions because DSK and Mr. Vinson "indisputably authorized and requested" an unsafe practice when they told Precision's drivers to traverse "the railroad tracks at DSK's private farm crossing with massive, low-clearance earthmoving equipment, especially without any spotters or first contacting the railroad."

We find this argument unavailing. There is no evidence that crossing railroad tracks with these tractors and scrapers is an "unsafe practice." In fact, Precision's drivers were able to successfully traverse the tracks several times, and it was not until one driver failed to raise his scraper that the scraper contacted the rail. (See Doc. 183-9, p. 79 –100). Thus, we find that simply driving across the railroad tracks with this type of machinery is not an "unsafe practice" for which DSK and 3-V can be held vicariously liable for its independent contractor's actions.

KCS' argument regarding spotters and contacting the railroad will be discussed below. Accordingly, the Landowner Defendants' motion for summary judgment on independent contractor status will be granted.

### d. Legal Duty Owed by DSK or 3-V

Next, we must next determine whether DSK or 3-V owed a legal duty to KCS. Louisiana law implements the duty/risk analysis in determining whether to impose liability under La. Civ. Code. art. 2315. This analysis consists of five separate prongs, the first of which is whether the defendant owed a duty to the plaintiff. See Pinsonneault v. Merchants & Farmers Bank & Trust Co., 816 So. 2d 270, 276 (La. 2002). The existence of a duty is a question of law, which is decided by the court. Id.

First, we look to see whether La. R.S. § 32:174 imposed a duty on DSK and 3-V to contact KCS before authorizing Precision to traverse the tracks. We find that it did not. Section 32:174 is a traffic regulation, which states, "No person shall operate or move (tow) any crawler-type

11

tractor . . . upon or across any tracks at a railroad grade crossing without first complying with this section." Subsection B requires that "[n]otice of any such intended crossing shall be given to a station agent of such railroad and a reasonable time be given to such railroad to provide proper protection at such crossing." La. R.S. § 32:174. According to its plain language, section 32:174 only applies to an operator of the listed equipment.[3] On the day of the derailment, Precision's employees were the only operators of the tractors used to repair the washed-out culvert. Accordingly, although Precision's employees may have had a duty under La. R.S. § 32:174 to contact KCS before crossing the tracks, neither DSK nor 3-V owed that duty to KCS.[4]

Next, the Landowner Defendants argue that they owed no duty to notify KCS prior to the derailment or to provide spotters when the machinery in question crossed the tracks under La. Civ. Code art. 2315. KCS claims that DSK, as the owner of the property "owed a legal duty to exercise reasonable care for the safety of persons, including KCSR, on his premises and to not expose such persons to unreasonable risks of harm." (Doc. 183, p. 35). According to KCS, this duty required DSK to contact KCS or provide spotters when crossing the tracks with this type of machinery. (Id.). We find that it did not.

A landowner has a general duty to exercise reasonable care and to not expose such persons to unreasonable risks of injury or harm on his property. See Patrick v. Employers Mut. Cas. Co., 745 So. 2d 641, 648 (La. App. 3d Cir. 1999). We have already determined above that DSK did not have a duty to notify KCS prior to this equipment crossing the tracks. We also find it improper, under Louisiana law or under the circumstances of this case, to extend a landowner's general duty to a requirement of providing spotters to ensure that equipment owned and operated by an

---

[3] KCS has made the same argument in a previous case which was also denied by the court. See Kansas City S. Ry. Co. v. Stoddart, No. 11-724, 2013 WL 55920, at *3 (W.D. La. Jan. 3, 2013).
[4] This said, no one has briefed whether the equipment actually used here even qualifies as a "crawler-type tractor" or any other type of equipment listed in the statute.

independent contractor safely crosses railroad tracks located on its private property, especially when the landowner is not present when the crossing takes place. The duty to provide spotters, if it existed at all, would have fallen on Precision, and Precision alone.

As to 3-V, KCS argues that 3-V assumed a duty to provide spotters when traversing the railroad tracks because it had a "regular practice" of providing such spotters for low-clearance vehicles. (See Doc. 183, p. 37).[5] One of the cases cited by KCS is Harris v. Pizza Hut of Louisiana, Inc., 455 So. 2d 1364 (La. 1984). In that case, a Pizza Hut restaurant patron was killed and another injured during an armed robbery. Pizza Hut had hired a security guard to patrol the premises, which guard was present at the time of the armed robbery. On the question of whether Pizza Hut assumed a duty, the Supreme Court of Louisiana stated, "Since the Pizza Hut was furnishing security through the services of a trained police officer, the question is whether the security guard breached his duty by adequate measures to protect those on the premises." Id. at 1371. Accordingly, "the question [was] not whether the Pizza Hut was required to have a security guard on the premises, but whether its security guard breached the applicable standard of care." Id. at 1371–72.

In this case, KCS argues that because 3-V previously used spotters for "low-clearance" equipment it had assumed a duty to do so again in this particular situation. However, unlike in Pizza Hut, 3-V did not provide spotters at the time the equipment traversed the tracks. As the Louisiana Supreme Court stated, whether 3-V had a duty to provide a spotter is irrelevant. See id. at 1371. "The question is not whether [3-V] was required to [provide spotters]," but, had 3-V

---

[5] KCS also haphazardly cites Johnson v. Harry Jarred, Inc., 391 So. 2d 898, 905 (La. Ct. App. 1980) for the proposition that "[c]ustom and usage may be regarded as a matter proper for consideration in determining whether or not sufficient care has been exercised in a particular case." However, this argument is futile since "determining whether or not sufficient care has been exercised" is a matter of breach of a legal duty. KCS must have first established a duty for us to reach the issue of breach. Its primary argument relies on whether 3-V assumed a duty to provide spotters.

provided the spotters, "whether its [spotters] breached the applicable standard of care." Thus, we find that 3-V did not assume a duty to provide spotters in this case.

On this same issue, KCS also claims that 3-V "must contact KCSR on the designated emergency number so that KCSR could protect its trackage." We interpret this as the same argument that 3-V had a duty to contact KCS before the equipment traversed the tracks. The sign located at the crossing in dispute stated, "Report problem or emergency 1-877-527-9464." Simply driving usual, not inherently damaging, equipment over the tracks is not a "problem or emergency." Thus, there would be no reason for Steven Vinson to call KCS before the incident occurred here. For, had Steven Vinson been present when the Precision employee negligently failed to lift his scraper, he may have a duty to contact KCS about the damage. However, it is undisputed that Mr. Vinson was away from the property when the dirt work was being performed and did not learn of the derailment until later that night or the next morning.[6] (See doc. 165-17, p. 4). As we previously said, 3-V had no duty under La. R..S. § 32:174 to notify KCS. Put simply, there is no legal basis to find against 3-V.

Finally, the Landowner Defendants argue that they did not owe a duty to KCS under La. Civ. Code art. 2317. KCS responds that DSK and 3-V are liable under article 2317 because both parties had custody or *garde* of the roadways and approach up to the edge of the ties. KCS posits that there is "a genuine dispute of material fact regarding whether DSK's private crossing, including DSK's private roadway approaches thereto, possessed a vice or defect that created an unreasonable risk of harm" because the roadway was "sloped" and "humped." (Doc. 183, p. 42).

KCS could have easily determined that this argument was spurious by simply looking at its own corporate deposition of Travis Ross, KCS' designated representative. (See Doc. 165-10).

---

[6] Steven Vinson's farm hand, Willie Triplett, was also not present when the Precision tractors traversed the tracks. (See Doc. 165-14, p. 10).

14

In that deposition, Ross was asked whether there was anything wrong with the slope of the approaches. He testified: "I don't see anything wrong with the approaches, no. It's a gradual approach. It's nice and smooth. No." We note that Ross went to the scene after the derailment, and stated that, other than the tire ruts from Precision's tractor, "[a]s far as the roadway, no. There was no issues with it, with the roadways, because they had just got through grading it. We could see the grade marks right up to our rail. So, yes, it was perfectly, freshly smooth."

Accordingly, we find that the Landowner Defendants' motion for summary judgment on no legal duty owed will be granted. We also find that the Landowner Defendants' motion for summary judgment on causation is moot. Finally, we do agree with the Landowner Defendants that there is no evidence in the record of anything but the negligence of the Precision tractor driver causing the derailment on March 21, 2013.

### e. Vicarious Liability

The Landowner Defendants claim in their third motion that "KCS' vicarious liability claims against the Landowners for the negligence of Precision were extinguished by KCS' voluntary dismissal, with prejudice, of Precision." (Doc. 201-1, p. 2). The Landowner Defendants rely on Rowell v. Carter Mobile Homes, Inc., 482 So. 2d 640 (La. App. 1st Cir. 1984), which held that in a principal-mandatary relationship "the obligation of the derivative obligor is identical to that of the primary obligor." Id. at 648. According to the Louisiana First Circuit, this meant that a plaintiff's settlement and dismissal of the principal's agent or mandatary also released the principal unless there was also independent fault by the principal. Id.

This argument rests on the assumption that Precision was an agent acting on behalf of its principal, the Landowner Defendants. However, the Landowner Defendants have vehemently argued throughout this litigation that Precision was an independent contractor for whose actions

15

no vicarious liability can attach. In their reply memorandum on the motion for summary judgment based on independent contractor status, the Landowner Defendants also argue that no agency relationship between either 3-V or DSK and Precision existed. (See Doc. 189, p. 6–7). We have already held their relationship to be an independent contractor relationship, not an agency relationship. Therefore the principle in Rowell does not apply here.[7] Thus, the Landowner Defendants' motion for partial summary judgment on vicarious liability will be denied.

### f. Loss of Profit Claim

Finally, American Reliable claims that KCS is not entitled to claim loss of profit because it had "spare" available locomotives in its fleet and used these locomotives in place of the damaged locomotives. American Reliable cites to a Fifth Circuit maritime case analogizing a claim for loss of profit for locomotives to loss of use of a vessel while under repair. See Dow Chemical v. M/V Roberta Tabor, 815 F.2d 1037, 1042–43 (5th Cir. 1987). However, maritime law has unique rules of law which routinely implement special substantive and procedural rules. In the context of loss of profit damages "arising from the loss of use of a vessel for repairs after a collision or other maritime tort," these damages have traditionally been called "detention damages." Id. Under this principal, a vessel owner can recover loss of use damages when there was a commercial use for that vessel and no "spare" vessel to replace it. Id.

This unique maritime principle has not been extended to loss of profits for railroad locomotives, and we do not think it is proper to do so. Contrarily, on at least one other occasion a federal district court applying Louisiana law has allowed—and the Fifth Circuit summarily affirmed—a loss of profits claim for a damaged locomotive "during the time reasonable [sic]

---

[7] Even so, the appellate court's reasoning relied upon by the Landowner Defendants is questionable in light of the subsequent Supreme Court decision. See Rowell v. Carter Mobile Homes, Inc., 500 So. 2d 748 (La. 1987).

necessary for the repairs." S. Pac. Transp. Co. v. Builders Transp., Inc., 1993 WL 484968, at *10 (E.D. La. Nov. 12, 1993) aff'd sub nom S. Pac. Transp Co. v. Builders Transp., Inc., 48 F.3d 531 (5th Cir. 1995). Accordingly, as there may be recovery under that principle, American Reliable's partial motion for summary judgment on KCS' loss of profit claim will be denied.

### III. Conclusion

For the foregoing reasons, (1) The Landowner Defendants' Motion for Summary Judgment on Causation (Doc. 161) will be **DENIED AS MOOT**; (2) The Landowner Defendants' Motion for Summary Judgment on Independent Contractor Status and No Legal Duty Owed (Doc. 165) will be **GRANTED**; (3) Plaintiff's Motion to Strike (Doc. 194) will be **GRANTED in part and DENIED in part**; (4) The Landowner Defendants' Motion for Partial Summary Judgment on Plaintiffs' Vicarious Liability Claims (Doc. 201) will be **DENIED**; and (5) American Reliable Insurance Co.'s Motion for Partial Summary Judgment on Kansas City Southern's Loss of Profit Claims (Doc. 203) will be **DENIED**.

SIGNED on this 17th day of February, 2016 at Alexandria, Louisiana.

                                          DEE D. DRELL, CHIEF JUDGE
                                          UNITED STATES DISTRICT COURT